## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-21597-Civ-TORRES

KERNEL RECORDS OY,

      Plaintiff,

vs.

TIMOTHY Z. MOSLEY, *et al.*,

      Defendants.

_____/

### ORDER ON DEFENDANT'S MOTION TO DISMISS

This matter comes before the Court on Defendant Nelstar Publishing, Inc.'s ("Nelstar") Motion to Dismiss Plaintiff Kernel Records Oy's ("Kernel") Amended Complaint for copyright infringement as against it pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, and to dismiss counts 2, 4, and 5 of the Amended Complaint against all parties, pursuant to Fed. R. Civ. P. 12(b)(7), failure to join a necessary party under Rule 19.  [D.E. 63]. We have considered the motion, response, and reply thereto, and the record in this case.  The Motion will be Granted in Part and Denied in Part.

## I.    BACKGROUND

### A.    *Procedural Background*

On June 12, 2009, Kernel filed its initial Complaint in the Southern District of Florida for infringement of its copyright "Acid Jazzed Evening".  [D.E.1].  Before any of the defendants to this original action answered, Kernel amended its Complaint on

February 2, 2010, adding an additional claim and additional defendants, including Defendant Nelstar. [D.E. 63]. The Amended Complaint asserts three claims against Nelstar (among other defendants): (i) Infringement of Kernel's Composition (Count 2); (ii) Action for Permanent Injunction (Count 4); and (iii) Accounting (Count 5). *Id.*

Nelstar filed this motion to dismiss for lack of personal jurisdiction on March 16, 2010. [D.E. 83]. Additionally, Nelstar seeks dismissal of Kernel's copyright infringement claims (Counts 2, 4, and 5) against all defendants, claiming Nelstar is both a "necessary" and "indispensable" party to resolving those claims pursuant to Fed. R. Civ. P. 12(b)(7) and 19. In its motion, Nelstar argues that: (1) the Amended Complaint fails to sufficiently allege facts to make out a *prima facie* case for personal jurisdiction; (2) the Florida long-arm statute does not provide a basis for exercising personal jurisdiction over Nelstar; (3) the exercise of personal jurisdiction over Nelstar would violate due process; and (4) without personal jurisdiction over Nelstar, this Court should dismiss the composition infringement claims against all parties.

On April 15, 2010, Kernel filed a response and argued that: (1) Nelstar is subject to personal jurisdiction under the Florida long-arm statute because it licensed the allegedly infringing work; (2) personal jurisdiction is also proper because Nelly Furtado is the alter-ego of Nelstar; (3) exercise of personal jurisdiction over Nelstar is appropriate under the Due Process Clause; and (4) Nelstar is not an indispensable party. Nelstar then filed a reply on April 26, 2010, reiterating that (1) the Amended Complaint alleges no jurisdictional facts concerning Nelstar; (2) Florida long-arm statute does not provide personal jurisdiction over Nelstar; (3) Nelstar is not Furtado's

"alter-ego"; (4) the exercise of personal jurisdiction would violate due process; and (5) Nelstar is an indispensable party to plaintiff's composition claims.

The motion was originally before the Court on an Order of referral for pretrial matters. Following briefing on the motion, the parties consented to the undersigned's jurisdiction over the case, and thus the issues are ripe for adjudication though this Order.

### B. *Facts Material to the Motion*

The action arises from a sound recording of a composition entitled "Acidjazzed Evening" created by Glenn Rune Gallefoss. [D.E. 1]. On August 16, 2007, Gallefoss transferred "all transferrable rights" to Plaintiff Kernel Records, a limited stock company organized under the laws of the country of Finland. Kernel Records alleges that the sound recording and musical arrangement of "AcidJazzed Evening" were copied into a new sound recording and musical composition called "Do It." [D.E. 83].

Defendant Nelstar is a 50% owner of the copyright in "Do It." [D.E. 95]. Additionally, Nelstar is a corporate publishing entity located in, and organized under the laws of Ontario, Canada. [D.E. 83]. Nelstar has no offices in Florida, does not conduct business in Florida, nor is it authorized or registered to conduct business in Florida. [D.E. 83]. Pursuant to a 2001 agreement, Nelstar owns the copyright in the songs written or co-written by co-defendant Nelly Furtado, who not only is the sole director of Nelstar, operating as President, Secretary, and Treasurer, but also owns 100% of Nelstar's stock since its inception. [D.E. 95]. Furtado wrote the lyrics – but not the music – and sang the recorded song at issue in this case known as "Do It." She

3

contributed her portion of the song while in Miami, Florida at a studio called "The Hit Factory." (Furtado Dep.)

Pursuant to a pre-existing June 1, 2006 administration agreement between Nelstar and co-defendants EMI April Music, Inc. and EMI Blackwood Music, Inc. (collectively, "EMI"; the "EMI Administration Agreement"), which was executed in New York and is governed by New York law, Nelstar granted EMI the exclusive worldwide right to license, publish, collect monies, and otherwise administer certain musical compositions written or co-written by Furtado, including Nelstar's 50% copyright ownership in "Do It." [D.E. 83]. All royalty statements generated from EMI's exploitation and administration of "Do It" are sent by EMI from New York to Nelstar in Toronto, Canada. *Id.*

Thereafter, EMI (on behalf of Nelstar) issued a mechanical license for "Do It" (as well as the other recordings on the Nelly Furtado album, "Loose") to co-defendant UMG Recordings, Inc. ("UMG"). *Id.* This mechanical license permitted – but did not require – UMG (through one of its divisions, co-defendant Interscope) to manufacture and distribute "Do It" on the "Loose" album on a national basis. The mechanical license, which was issued by EMI in New York, ultimately resulted in Interscope's sale of "Loose" throughout Florida.

Based on the foregoing activities, Kernel alleges in its Amended Complaint that Nelstar "purposefully directed 'Do It' into the state of Florida" and "availed [itself] of the jurisdiction of this Court by transacting business in this District and the State of Florida concerning the song at issue in this action." [D.E. 63]. Additionally, Kernel

4

contends that its allegations against Furtado subject Nelstar to personal jurisdiction in Florida based on an alter-ego liability theory.

## II.   ANALYSIS

### A.   *Dismissal for Lack of Personal Jurisdiction*

Nelstar alleges that this Court lacks personal jurisdiction over it because Nelstar's activities do not meet the requirements of the Florida long-arm statute, and, moreover, due process prevents this Court from exercising jurisdiction over Nelstar. [D.E. 83].

### 1.   *Applicable Law*

Federal Rule of Civil Procedure 12(b)(2) allows a dismissal of a complaint for lack of personal jurisdiction.  Fed. R. Civ. Pro. 12(b)(2).  To prevent dismissal, the "plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  "A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for directed verdict." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  "Once the plaintiff pleads sufficient material facts to form the basis for *in personam* jurisdiction, the burden shifts to the defendant to challenge plaintiff's allegations by affidavits or other pleadings." *Structural Panels, Inc. v. Texas Aluminum Indus., Inc.*, 814 F. Supp. 1058, 1068 (M.D. Fla. 1993).  "If the defendant sufficiently challenges plaintiff's assertions, then the plaintiff must affirmatively support its jurisdictional allegations and may not merely rely upon the factual

allegations set forth in its complaint." *Id.* Furthermore, the district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits. *Morris*, 843 F.2d at 492. Where the parties' affidavit and deposition evidence conflict, the district court must construe all reasonable inferences in favor of the plaintiff. *Id.*

The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by federal courts. *Cable / Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). First, the court examines the jurisdictional issue under the state's long arm statute. *Id.* Second, the court must ascertain whether or not sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit does not offend "traditional notion of fair play and substantial justice." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### 2. *The Florida Long-Arm Statute*

"When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, Rule 4(e) of the Federal Rules of Civil Procedure directs us to look to the state long-arm statute to determine the existence of personal jurisdiction." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626-627 (11th Cir. 1996) (citing *Cable / Home Commc'n,* 902 F.2d at 855). While jurisdiction exists in the district court for copyright statutory violations, there is no service of process provision. *See* 28 U.S.C. §§ 1331, 1338 (1982). Accordingly, Rule 4(e) directs us to the Florida long-arm statute in order to determine the amenability of nonresident defendants to

6

jurisdiction in Florida.  Fla. Stat. § 48.183 (1987); *Cable/Home Commc'n*, 902 F.2d at 855-56.

As construction of Florida's long-arm statute is a question of Florida law, we must analyze the statute according to Florida Supreme Court precedent.  *See, e.g.*, *United Techs. Corp.*, 556 F.3d at 1274-75.  When such precedent is not directly on point, federal courts applying state law are bound by the intermediate appellate court decisions absent a persuasive indication that the state's highest court would decide the issue otherwise.  *See Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1377-78 (S.D. Fla. 2005) (citing *Silverberg v. Paine, Webber, Jackson, & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir. 1983)).

The Florida long-arm statute provides jurisdiction for a tortious act within the state as follows:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself, and if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action from doing any of the following acts:

[. . .]

> (b) Committing a tortious act within this state.

[. . .]

> (f) Causing injury to persons or property withint this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>
> > 1.  The defendant was engaged in solicitation or service act within this state; or
> >
> > 2.  Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or

> consumed within this state in the ordinary course of commerce, trade or use.

Fla. Stat. § 48.193(1)(b) and (f).

Kernel argues that Nelstar is subject to jurisdiction under the Florida long-arm statute for two reasons. First, Kernel claims that by licensing the allegedly infringing work to co-defendant EMI, Nelstar is subject to personal jurisdiction under sections (1)(b) and (1)(f) of Florida's long-arm statute. [D.E. 95]. This licensing agreement authorized EMI the "broadest possible rights to administer and otherwise exploit" Nelstar's musical compositions throughout the universe. Doc. No. 82-2 at 8, ¶ 7.01. Pursuant to this agreement, EMI then issued a mechanical license to co-defendant Interscope, who reproduced and distributed the album "Loose" (which contains "Do It") throughout Florida. Second, Kernel claims that Nelstar committed the tort of copyright infringement in Florida because Furtado, who created "Do It" in Florida, is the "alter-ego" of Nelstar. [D.E. 95].

   a.   *Nelstar's Licensing of "Do It" to EMI*

In applying section 1(b) of the Florida long-arm statute, some Florida intermediate appellate courts have interpreted it narrowly and found that there is no jurisdiction over someone that commits a tortious act outside the state that results in injury in the state. Other Florida district courts, however, have reached the opposite conclusion and found jurisdiction under a broader interpretation of section 1(b). *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209 (11th Cir. 1999). The Florida Supreme

Court has not squarely reconciled the conflicting decisions from the district courts of appeal. *Id.* at 1216-17.

The Eleventh Circuit, however, has consistently applied the broader construction of subsection 1(b) and found personal jurisdiction over someone who commits a tortious act outside the state that results in harm inside the state. *Id.* at 1216 (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 257 (11th Cir. 1996); *Sun Bank, N.A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1033-34 (11th Cir. 1991). Therefore, under the Eleventh Circuit's construction of the elements required for jurisdiction under section 48.193(1)(b), this statute permits jurisdiction over a non-resident defendant who commits a tort outside of the state that causes injury in the state; physical presence of the defendant in Florida is thus not required in all instances." *See also Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002).

Although the Eleventh Circuit has extended the Florida long-arm statute to foreign tortious conduct causing harm within Florida, the facts here do not warrant such an application. In cases where the Eleventh Circuit applied section (1)(b) to foreign torts causing injury within Florida, that conduct was directed at Florida residents, corporations, or property, and the harm was felt exclusively or primarily in Florida. *See e.g.*, *Int'l Harvester Co. v. Mann,* 460 So. 2d 580, 582 (Fla. 1st DCA 1984) (finding personal jurisdiction based upon fact that the "physical assets and  . . . . operation as a business" of the corporation allegedly injured "were solely within the state of Florida."); *Elandia Int'l, Inc. v. Koy*, No. 09-20588-Civ-MORENO/TORRES,

9

2009 U.S. Dist. LEXIS 125051, *26 (S.D. Fla. August 24, 2009) (extending section (1)(b) because plaintiff corporation's principal place of business was in Florida, tort of breach of fiduciary duty was directed at Florida, harm felt in specifically in Florida); *Precision Software Servs., Inc. v. Fortune Fin. Sys., Inc.*, No. 98-136-CIV-FTM-17D, 1998 U.S. Dist. LEXIS 22068, * 11 (M.D. Fla. Oct. 13, 1998) (defendant shipped infringing material, that it manufactured, into Florida to a Florida corporation).  Here, on the other hand, the alleged injury is in no way particular to, or directed at, Florida. Not only did the EMI licensing agreement place no obligation to distribute the song in Florida, but it also rendered Nelstar entirely incapable of directing the song into Florida.  [D.E. 83].  In addition, Plaintiff Kernel is not a Florida corporation, nor does it have a special interest in the Florida market.  *Cf.*, *Cable/Home Commc'n Corp.*, 902 F.2d  at 857 (finding personal jurisdiction only because a "substantial aspect of the alleged tort occurred in Florida.");  *see also Posner*, 178 F.3d at 1217 (foreign tort specifically damaged property in Florida).

Furthermore, "the tort of copyright infringement occurs at the place of passing off the allegedly infringing item, which is typically the place of sale, rather than the location where the infringing item was copied or created."  *J. Racenstein & Co., Inc. v. Wallace*, 1997 WL 605107, 44 U.S.P.Q.2D (BNA) 1541, 1543 (S.D.N.Y 1997).  Here, Nelstar's "sale" of the allegedly infringing copyright occurred in New York, not Florida. Therefore, the brunt of the alleged copyright infringement occurred in New York, and not Florida.  *See Robinson v. Arista Records, Inc.*, No. 3:04CV431, at pp. 10-16 (S.D. Ohio Aug. 5, 2005) (holding that publishing defendant's "acts of alleged

copyright infringement occurred in New York" where the mechanical licenses were issued, despite the copyrights being sold throughout the U.S. by a third party distributor).  Consequently, we find that Nelstar is not subject to section (1)(b) based on its licensing of "Do It" to EMI.

Kernel also claims that section (1)(f) of the Florida long-arm statute should apply to Nelstar's licensing "Do It" to EMI.  However, nowhere in its amended complaint or in its briefs does Kernel make any prima facie showing that Nelstar "processed, serviced, or manufactured" in the state of Florida.  Therefore, Kernel also has failed to sustain its burden with regard to (1)(f) of the long-arm statute.

   b.    *Nelstar's Alter-Ego Liability*

Kernel focuses much of its jurisdictional defense on the argument that Nelstar is subject to personal jurisdiction by virtue of Furtado's actions in the forum.  According to Kernel, Furtado is the alter-ego of Nelstar and, moreover, she is using Nelstar for an improper purpose.  If Furtado were indeed found to be the alter-ego of Nelstar, then Nelstar would undoubtedly be covered by either 1(b) or 1(f) of Florida's long-arm statute.  In opposition to these allegations, Nelstar asserts that there is no basis to find that it is not an entirely legitimate, independent publishing company that owns and exploits the copyrights to Furtado's songs.

   (1)   Choice of Law

As an initial matter, Nelstar contends that Canadian law should control the veil-piercing analysis because of the general rule that "the law of the state of incorporation is to be applied." *See Sparton Elecs. Fl., Inc. v. Electropac Co.*, No. 8:05-cv-1495-T-

11

30TBM, 2006 WL 2711842, at * 2 (M.D. Fla. Sept. 21, 2006).  It is undisputed that Nelstar is organized under the laws of Ontario, Canada.  [D.E. 63].  Kernel Records, on the other hand, argues that Florida law should apply pursuant to the "most significant relationship" exception outlined in the Restatement (Second) of Conflict of Laws § 302.

"When determining claims involving corporations both the Eleventh Circuit and the Florida state courts have further analyzed choice of law questions by looking to the Restatement (Second) of Conflict of Laws for guidance."  *Milliken & Co. v. Haima*, *Group Corp.*, No. 08-22891, 2010 U.S. Dist. LEXIS 44835, * 9 (S.D. Fla. Mar. 1, 2010) (citing *Int'l. Ins. Co. v. Johns*, 874 F.2d 1447, 1458 (11th Cir. 1989)).  The relevant portion of the Restatement states:

§ 302.  Other Issues with Respect to Powers and Liabilities of a Corporation

(1) Issues involving the rights and liabilities of a corporation, other than those dealt with in § 301, are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) The local law of the state of incorporation will be applied to determine such issues, except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other will be applied.

Restatement (Second) Conflict of Laws § 302 (1971).

In applying § 302, "the law of the state of incorporation normally determines issues relating to *internal* affairs of a corporation.  Application of that body of law

achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 622 (1983). However, "[d]ifferent conflicts principles apply [ ] where the rights of third parties *external* to the corporation are at issue." *Id.* This is because "[t]o give conclusive effect to the law of the chartering state. . . would permit the [corporation] to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." *Id.*

Moreover, when a corporation has little contact with the state of its incorporation, the law of some other state should be applied when "(1) the relevant local law rules of the other state embody an important policy of that state and (2) the matter involved does not affect the corporation's organic structure or internal administration." Restatement (Second) of Conflict of Laws § 302, Comment g. Therefore, the law of the state of incorporation will not apply when another state "has the dominant interest in having its local law rule applied to determine the particular issue." *Id.*

Here, we agree with Kernel that § 302's exception should apply favoring Florida law. As in *Milliken*, here "[t]he collection of the judgment at issue has absolutely no significant relationship to [the] state of incorporation." *Milliken*, 2010 U.S. Dist. LEXIS 44835, at *11. It is undisputed that Nelstar has no offices, no phone number, no employees, and no shareholders besides Furtado. Given these minimal ties to the state of incorporation, and that the expectations of the corporation's shareholders are

hardly a prevailing interest, Canada's interest in applying its local law in this case is minimal.  *See id.*  Thus, although the state of incorporation remains a relevant contact within the analysis, "more germane to the inquiry are the points of contact and transactions by which defendants allegedly disregarded the corporate form to the detriment of third parties."  *Id.*

In the Amended Complaint, Kernel alleges that Furtado, acting as an alter-ego of Nelstar, created the allegedly infringing work "Do It" in Florida.  [D.E. 83-1].  If Nelstar were to be liable on an alter-ego theory, it would be based on Furtado's action in this forum.  Therefore, Florida "has the dominant interest in having its local law rule applied."  *See* Restatement (Second) of Conflict of Laws § 302, Comment g.  Additionally, the comments of the Restatement make clear that the veil-piercing analysis does not "involve a corporation's organic structure or internal administration" so that the law of the state of incorporation should automatically apply.  *See id.*  Rather, the alter-ego analysis is an "issue[] which [is] peculiar to corporations."  *Id.*  As such, the state of incorporation has a diminished interest in applying its local law and the situs of material events should control.  *Id.*

Finally, Florida and the United States as a whole have a significant interest in ensuring that international corporations do not engage in fraudulent conduct within our jurisdiction so as to shield themselves from liability.  *See Banco*, 462 U.S. at 622.  Accordingly, Florida law should and will determine the alter-ego analysis in this case.

(2)   Alter-Ego Analysis

Although Nelstar is separately incorporated, "[u]tilization of the corporate structure does not preclude personal jurisdiction as to the dominant shareholder where the corporate entity is merely the shareholder's alter ego and is used for a fraudulent or misleading purpose to shield improper conduct." *Woods v. Jorgensen*, 522 So. 2d 935, 937 (Fla. 1st DCA 1988) (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114 (Fla. 1984)).  In order to pierce the corporate veil, plaintiff must prove both that the corporation is a mere instrumentality or alter ego of the defendant, and that the defendant engaged in improper conduct in the formation or use of the corporation. *XL Vision, L.L.C. v. Holloway*, 856 So. 2d 1063, 1066 (Fla. 5th DCA 2003).

For jurisdictional purposes, the plaintiff must make a specific showing of *intent* to engage in improper conduct.  For example, in *Mason v. E. Speer & Assocs., Inc.*, 846 So. 2d 529, 534 (Fla. 4th DCA 2003), although the court found that "there [was] sufficient evidence that [defendant] improperly converted corporate property to his own use on more than occasion," it nonetheless held that the "[plaintiff] simply did not carry his burden in establishing that these transactions were made with a deliberate *intent* to mislead creditors."  *See also Resolution Trust Corp. v. Latham & Watkins*, 909 F.Supp. 923, 931 (S.D.N.Y 1995) (analyzing Florida law) ("Absent proof of intentionally fraudulent conduct, courts simply do not pierce the corporate veil under Florida law.").

Next, once the plaintiff has made allegations sufficient to pierce the corporate veil for jurisdictional purposes, the defendant corporation then has the duty of rebutting the allegations against it.  *See Merkin v. PCA Health Plans of Florida, Inc.*,

15

855 So. 2d 137, 142 (Fla 3d DCA 2003) (finding alter-ego liability because "[corporation] failed to address whether [it] had been *used* for improper purposes."). In cases where the allegations of improper conduct involve fraudulently evading liability, "the corporation's controlling shareholder formed or used the corporation to defraud creditors by evading liability for preexisting obligations." *Estudios, Proyectos E Inversiones de Centro America, S.A. v. Swiss Bank Corp.*, 507 So. 2d 1119, 1120 (Fla. 3d DCA 1987) (citing *Dania Jai-Alai*, 450 So. 2d 1114). Accordingly, a mere showing that a corporation limits liability is not enough to pierce the corporate veil. As explained by the Florida Supreme Court in *Roberts Fish Farm v. Spencer*, 153 So. 2d 718, 721 (Fla. 1963):

> The corporate entity is an accepted, well used and highly regarded form of organization in the economic life of our state and nation. As we said in *State ex. rel. Continental Distilling Sales Co. v. Vocelle*, 1946, 158 Fla. 100, 27 So. 2d 728, 'Their purpose is generally to limit liability and serve a business convenience.' Those who utilize the laws of this state in order to do business in the corporate form have every right to rely on the rules of law which protect them against personal liability unless it be shown that the corporation is formed or used for some illegal, fraudulent, or other unjust purpose which justifies piercing of the corporate veil.

In the present case, Kernel's allegations fail to establish the requisite intent to engage in or shield improper conduct. Kernel supports its theory of alter-ego liability with the following arguments: (1) "Before the creation of Nelstar Publishing, Furtado signed an agreement licensing all compositions she would subsequently create; Nelstar Publishing merely collects the revenues from that license; (2) Furtado creates Nelstar Publishing, Inc. and gives away all her past and future compositions for one Canadian dollar; (3) Furtado creates "Do It;" "Do It' magically becomes owned by Nelstar; (4)

Nelly Furtado tells EMI April that Nelstar Publishing furnishes her songwriting services and guarantees personal performance of Nelstar Publishing's deal with EMI; and (5) Nelstar Publishing transfers huge amounts of money to another Furtado-owner Corporation, Nelstar Entertainment, Inc. for doing nothing."  [D.E. 163].

The problem for Kernel is, however, that taken together these allegations do not establish an intent to engage in improper conduct.  To begin with, Nelstar was formed nine years ago, long before "Do It" was created. [D.E. 83; Ex. G].  There is absolutely no evidence that shows Nelstar intended to infringe upon anyone's rights as opposed to being a licensing vehicle for Ms. Furtado's own music.  In fact, this is the first such lawsuit brought against Nelstar.  [D.E. 103].  The present case is thus distinguishable from cases where fraudulent intent was proven.

For example, in *Swiss Bank* there was a history of transferring property to a corporation in order to shield it from creditors who were already after it – the plaintiff provided facts to show that defendant formed the corporation to "use [it] to secrete his personal assets and thereby defraud his creditors."  *Swiss Bank Corp.*, 507 So. 2d at 1121.  On the other hand, here there is no evidence that Nelstar had the intention of defrauding anyone when she formed her license holding corporation, let alone Kernel.

Additionally, Kernel repeatedly attacks Furtado's assignment of her copyrights to Nelstar, claiming that "'Do It' magically [became] owned by Nelstar."  [D.E. 163]. However, the clear language of the agreement transfers songs written by Furtado in the future.  The impact of the language is unambiguous; once a song has been completed, it is assigned to Nelstar.  Kernel's reliance on the creation of the agreement

17

before the song does nothing to show that Nelstar is being used for an improper purpose.

Similarly, Kernel's claims that Furtado assigned her songs to Nelstar for one dollar or that money is transferred between Nelstar Publishing and Nelstar Entertainment do not warrant a finding of fraudulent intent. The transfer of assets between Nelstar Publishing and Nelstar Entertainment does not shield Nelstar from adverse judgments against it and is not a fraudulent activity. To sufficiently support its position, Kernel must have shown that Furtado was using Nelstar's corporate veil to improperly shield her assets. Instead, Kernel has only pointed out legitimate activities under which Nelstar has "every right to rely on the rules of law which protect[s] [it] against personal liability. *Roberts' Fish Farm*, 153 So. 2d at 718. Furtado is permitted to form a corporate entity to own the copyrights to her songs and to engage in music publishing activities in connection with those copyrights, so long as she incurs the resulting increased costs and taxes that may be associated with such an enterprise. And, by the way, to the extent that Kernel turns out to be right and the assignment of the "Do It" license was ultimately found to be ineffective or illusory, it seems that Kernel could then proceed directly against Ms. Furtado and avoid Nelstar altogether. But that issue is entirely premature at this point.

What is not premature is the conclusion that Kernel's alter-ego theory for subjecting Nelstar to jurisdiction in Florida, based upon the allegedly tortious conduct in Florida by Nelstar's sole shareholder, strikes a sour note. Absent a more substantial

showing of improper conduct than that revealed in this record, we are compelled to reject Kernel's alter-ego theory.

      c.    *Nelstar's Agreement with EMI*

Kernel, through its supplemental briefing, adds an additional argument in support of jurisdiction that maintains that "Nelstar Pubishing's Agreement with EMI waives Nelstar's personal jurisdiction defense." [D.E. 163]. Pursuant to this agreement with EMI, Nelstar submits to the jurisdiction of any court where EMI is sued based on Nelstar's alleged copyright infringement. [D.E. 95, Ex. D., ¶¶ 16, 21]. Thus, in the event of litigation between Nelstar and EMI, EMI could argue that jurisdiction could lie by consent anywhere in the country, including Florida. EMI has not raised any cross-claims against Nelstar in this action.

That being the case, Kernel has no means by which to benefit from this agreement. The agreement is between Nelstar and EMI; Kernel has no standing to enforce it. And it has not argued that it is a third-party beneficiary from such an agreement. Kernel's reliance on this agreement is thus clearly misplaced. Otherwise, we would be finding that Nelstar's consent with one party subjected it to general jurisdiction nationwide, a principal that clearly runs straight up against the due process clause. Kernel has not cited any authority for that overbroad proposition, not surprisingly. Kernel can thus not obtain jurisdiction over its claims against Nelstar based upon Nelstar's waiver of jurisdiction with EMI.[1]

---

    [1]    We note that even if Nelstar's agreement with EMI could be enforced by Kernel, a third party to that agreement, Kernel's reliance on this agreement would still

### 3.  Due Process

Even if Florida's long-arm statute were satisfied in this case, personal jurisdiction over Nelstar still cannot be exercised under the requirements of the Due Process Clause.  *See, e.g., United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1275 (11th Cir. 2009).   Only if both requirements are satisfied may a court exercise personal jurisdiction over a nonresident defendant.  *Id.*

"The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which he has established no meaningful contacts, ties, or relations."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).   Due process requires that in order to subject a non-resident defendant to an *in personam* judgment it must have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.  *Int'l Shoe,* 326 U.S. at 316.

Due process involves a two-part inquiry: first, whether Nelstar has established "minimum contacts" with Florida; second, whether the exercise of personal jurisdiction

---

be unavailing under Florida law.  *See Jetbroadband WV, LLC v. MasTec North America, Inc.,* 13 So. 3d 159, 161 (Fla. 3rd DCA 2009) ("Generally, an agreement alone is insufficient to confer personal jurisdiction on Florida courts.  *McRae v. J.D./M.D., Inc.,* 511 So. 2d 540 (Fla. 1987).").  A party cannot rely on a contractual agreement, standing alone, to overcome the requirements of the long-arm statute.  And the statutory exception to this principle, Fla. Stat. § 685.101, clearly could not benefit a third party to the agreement, like Kernel, who had no connection with Florida.  Thus, given that Nelstar has no other connection with Florida, Florida law would not support exercising jurisdiction over Nelstar notwithstanding its agreement with EMI.

over Nelstar would offend " 'traditional notions of fair play and substantial justice.' " *See id.* This requires that Nelstar have "fair warning" that a particular activity may subject it to the jurisdiction of a Florida court. *See Madara v. Hall,* 916 F.2d 1510, 1516 (11th Cir. 1990) (citing *Burger King,* 471 U.S. at 472). This fair warning requirement is satisfied if Nelstar has "purposefully directed" its activities at this forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities. *See Madara,* 916 F.2d at 1516. Therefore, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Hence, Nelstar's conduct and connection with Florida must be such "that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

These principles are applied differently to different forms of personal jurisdiction, specific and general. Specific jurisdiction attaches only to suits arising from a defendant's contact within the forum, whereas general jurisdiction can more broadly attach to suits unrelated to defendant's contacts with the forum. *Helicopteros Nacionalesde Colombia, S.A. v. Hull*, 466 U.S. 408, 414-15 n. 8-9 (1984). Kernel here makes no argument for general jurisdiction. Accordingly, we focus the due process analysis for specific jurisdiction.

Where specific jurisdiction is asserted, the following three conditions must be satisfied in order to find that the exercise of personal jurisdiction over Nelstar is

21

constitutional: (1) Nelstar must purposefully avail itself of the privilege of acting in the forum state; (2) the cause of the action must be related to Nelstar's contacts with the forum or arise from Nelstar's activities here; and (3) the Nelstar's acts or consequences caused by those acts must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction over Nelstar reasonable.  *See, e.g., Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir. 1994).

    a.    *Purposeful Availment*

Kernel argues that Nelstar purposefully availed itself of the privileges of conducting business in Florida because of Nelstar's license agreement with EMI that ultimately resulted in Interscope's distribution of "Do It" throughout Florida.  Because EMI is a "major record company" that deals on a national scale, Kernel asserts that Nelstar knew, or should have known, that its song would be sold in the Florida market.  Moreover, Kernel points to the EMI agreement, wherein Nelstar agrees to submit to the jurisdiction of any court where EMI is sued, to show that Nelstar should have anticipated being haled into court in Florida.  Finally, Kernel contends that Furtado's creating "Do It" in Florida evidences Nelstar's purposeful availment of the forum state.  Based on these allegations, Kernel claims that exercising jurisdiction over Nelstar is consistent with the Due Process Clause.

The undisputed facts are that Nelstar has no offices in Florida; it has no employees in Florida; it has never advertised, conducted business or solicited business in Florida; it is not registered to do business in Florida; it has never contracted with anyone located in Florida; and it does not have a registered agent to accept service of

process in Florida. (*See generally* Smith Decl.; Ex. F.).  These facts all support Nelstar's contention that it lacks sufficient minimum contacts with Florida.

Nelstar's agreement with EMI does not rise to the level of purposeful availment required to satisfy the due process clause because the mere generalized exploitation of an infringing work into the stream of commerce does not amount to purposeful availment.  *See Tomashevsky v. Komoro Printing Machinery Co., Ltd.*, 715 F. Supp. 1562, 1565 (S.D. Fla. 1989) ("the plaintiffs have shown no evidence that any of the distributors directed their sales at Florida . . . . the resale to the Florida purchaser here was not a purposeful contact by [defendant]."); *Structural Panels, Inc. v. Texas Aluminum Indus., Inc.*, 814 F. Supp. 1058, 1066 (M.D. Fla. 1993) (noting that "there is no indication that [defendant] designed the product for the Florida market, or established marketing channels for the product in Florida.").  Allegations that Nelstar "should have known" the song would be distributed in Florida is not sufficient to allege purposeful availment.  *See Gifford v. Thinking Outside, LLC, KSQ*, 506 F. Supp. 2d 1104, 1108 (N.D. Fla. 2007) (finding no purposeful availment because once the defendant passed on its product to a third party, its control over the product was nonexistent).  Here, neither Nelstar's agreement with EMI nor EMI's agreement with Interscope mentioned Florida, nor was at directed at the Florida market in particular.  And after issuing the mechanical license for "Do It" to EMI, Nelstar had no involvement in Interscope's manufacture and distribution activities because it was incapable of directing any sales of "Do It" to Florida customers.  (Smith Decl. ¶ 3.).

23

Kernel's principle case on this issue, *Precision Software*, 1998 U.S. Dist. LEXIS 22068, at *18-19, does not apply.  In that case, the defendant sold and shipped its products to a Florida corporation with the knowledge that its products would be distributed to consumers in Florida.  *Id.*  Furthermore, it maintained a website accessible in Florida.  *Id.* at *11.  Therefore, the defendant reached into Florida and directed its products into the state of Florida, where it could be reasonably certain that the products would be disseminated there.  Here, on the other hand, Nelstar had no contact with any Florida corporation and did not advertise within Florida.  Also, in *Precision*, unlike here, the defendant was the actual manufacturer of the product, rather than just a licensor.  As a result, it was the defendant's "ongoing act of selling products [to a Florida Corporation] knowing that these products would be distributed throughout Florida" that satisfied the due process clause.  *Id.* at *16.  As Nelstar neither directed "Do It" into the state of Florida nor did business with a Florida corporation, the two cases are easily distinguishable.

By contrast, the present case is more factually analogous to *Robinson v. Arista Records, Inc.*, No. 3:04CV431, Order at 10-16 (S.D. Ohio Aug. 5, 2005).  There, it was undisputed that the publishing defendant was "not a resident of the state of Ohio, does not maintain an office in Ohio, does not transact or conduct any business in Ohio, does not advertise in Ohio or cause others to advertise in Ohio, and does not supply services or goods in Ohio."  *Id.*  Although the defendant issued two mechanical licenses to Arista Records, who ultimately sold the songs in Ohio, the United States District Court for the Southern District of Ohio held that the publishing defendant had neither reached

24

into Ohio nor purposefully availed itself of acting in Ohio. *Id.* Significantly, the court noted the contract's failure to require the defendant to perform any act in the forum or to reach into the forum. *Id.*

Similarly, in *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472 (6th Cir. 2003), the court concluded that because the defendant publisher's licensing agreement lacked "an affirmative obligation upon the third party to distribute [the publisher's] compositions in [the forum]." *Id.* Therefore, "[the publisher defendant's] knowledge that [the record company] was likely to distribute [the publisher's] compositions nationally, coupled with its lack of objection to Tennessee sales . . . . is insufficient conduct upon which to predicate purposeful availment." *Id.* at 480.

For similar reasons, we also find that Nelstar has not purposefully availed itself of the forum because the mere allegation that Nelstar knew, or should have known, that its song likely would end up in Florida is not sufficient.

b.  *Nelstar's Forum-Related Activities*

To assert specific jurisdiction, the claim asserted by Kernel must arise out of Nelstar's forum-related activities. There is no evidence, however, of any forum-related activities by Nelstar, except through Furtado. As mentioned previously, Nelstar has no offices in Florida, no employees in Florida, and has never advertised, conducted business or solicited business in Florida. Although it is true that Furtado created "Do It" within the forum, Nelstar Publishing is an entity separate from Furtado. Kernel has not established that Furtado was working Florida in her official capacity with Nelstar nor that Nelstar played any part in Furtado's creation of "Do It." Therefore,

25

absent a finding of alter-ego status that we have already rejected, Nelstar's Florida-related activities are insufficient to meet the second prong of this inquiry.

       *c.*     *Reasonableness and Fairness*

Turning to the final prong of the specific jurisdiction analysis, assuming that the non-resident defendant has minimum contacts with the forum such that he should reasonably anticipate being haled into court there, those contacts must then be evaluated, in light of other factors, to decide whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Burger King,* 471 U.S. at 476 (quoting *Int'l Shoe,* 326 U.S. at 320).  The five *Burger King* factors to weigh are: (1) "the burden on the defendant;" (2) "the forum State's interest in adjudicating the dispute;" (3) "the plaintiff's interest in obtaining convenient and effective relief;" (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive policies." *Id.* at 477.  Minimum requirements of "fair play and substantial justice" may defeat the reasonableness of asserting personal jurisdiction even if the defendant has purposefully engaged in forum activities. Conversely, these considerations may serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.  *Madara,* 916 F.2d at 1517.

Here, the burden on Nelstar to litigate in Florida would be minimal, given that Nelstar's counsel is already representing co-defendant EMI.  However, considering the very few contacts Nelstar has with Florida, the state of Florida's interest in the issue

is limited. Furthermore, the fact that Kernel is a Finnish company who originally brought this action in Finland minimizes Florida's interest in adjudication of this case. Also, given that Nelstar has stipulated to jurisdiction in New York, the last two factors do not weigh in favor of any party. In sum, the relevant factors are fairly balanced, but tilt in favor of Nelstar's position that jurisdiction over Nelstar here would be neither reasonable nor fair.

In sum, the strongest argument against the exercise of personal jurisdiction against Nelstar here is Kernel's inability to satisfy Florida's long-arm statute. That finding alone ends the inquiry. But in addition, the due process analysis also points in the same direction. The Court finds that it cannot exercise personal jurisdiction over Nelstar in this case. Consequently, Nelstar's Motion to Dismiss all claims against it in the action, as per Rule 12(b)(2), must be granted.

### B.   *Dismissal for Failure to Join an Indispensable Party*

Defendant Nelstar, on behalf of all Defendants, next contends that if it is dismissed from this lawsuit, Counts 2 through 5 of the Amended Complaint should be dismissed pursuant to Federal Rules 12(b)(7) and 19(b), failure to join a necessary and indispensable party. Earlier in the action, however, Count 3, seeking a Declaratory Judgment, was dismissed. Accordingly, we consider whether Count 2 for copyright infringement of the musical work, Count 4 for permanent injunction, and Count 5 for accounting should also be dismissed. For the following reasons, the Court finds that the motion should be granted but only as to Count 4.

### 1.   *Applicable Law*

Rule 12(b)(7) provides that a complaint should be dismissed upon a plaintiff's "failure to join a party under Rule 19."   Rule 19 sets forth a two-step analysis in deciding whether to dismiss an action for failure to join an absent party.  First, Rule 19(a) provides a framework for deciding whether a given person or party should be joined.  This question has been commonly analyzed as whether the non-joined party is "necessary."   Second, if joinder is called for, then Rule 19(b) guides a court in deciding whether the suit should be dismissed if that person cannot be joined.  This question has been commonly analyzed as whether this necessary party  is 'indispensable'. *Stafford Trading, Inc. v. Lovely*, No. 05 C 4868, 2007 WL 1512417, at * 12 (N.D. Ill. May 21, 2007).  If an absent party is both "necessary" and "indispensable," then claims affecting that party's rights should be dismissed and re-asserted in a forum where that party can be joined.

Specifically, Rule 19(a) provides that a party must be joined in an action if:

(1) in the person's absence complete relief cannot be accorded among those already parties, or

(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest.

If a court determines that a party is necessary under Rule 19(a), it must next examine whether, under Rule 19(b), "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being

thus regarded as being indispensable." Fed. R. Civ. P. 19(b). Rule 19(b) includes four factors to consider in deciding whether an absent party is "indispensable": (1) to what extent a judgment rendered in the person's absence might be prejudicial to [the person] or to those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. *Id.* During all phases of the analysis, "[t]he court must consider the extent to which the judgment may as a practical matter impair or impede his ability to protect his interest in the subject matter." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110 (1968).

## 2. Is Nelstar a Necessary Party?

Defendant Nelstar argues that it is a necessary party under Fed. R. Civ. P. 19(a) because Kernel's claims impact its rights as an *owner*. As such, Nelstar argues it is clearly a party that "claims an interest relating to the subject of the action" and whose absence would "impair or impede the person's ability to protect that interest," or would expose persons already parties to "substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest." Fed. R. Civ. P. 19(a)(2)(i) and (ii).

In opposition, Plaintiff fervently argues that the rule of joint and several liability governs copyright infringement. Therefore, according to Plaintiff, Nelstar does not meet the criteria enumerated in 19(a). It is true, as articulated by the Seventh Circuit

in *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 877 (7th Cir. 2004), that a recognized principle of law relevant to Rule 19 is:

> the victim of a tort is entitled to sue any of the joint tortfeasors and recover his entire damages from that tortfeasor. The defendant may have a right to contribution (i.e., to a sharing of the pain) from the other tortfeasors, but the victim is not required to sue more than one of his oppressors. A rule automatically deeming joint tortfeasors indispensable parties to suits against each of them would be inconsistent with this common law principle and is therefore rejected.

Additionally, Plaintiff offers numerous cases that state the same proposition. Each case, however, includes the same distinguishing factor from the present case: the defendant(s) are not co-owners of the allegedly infringing copyright, like Nelstar is here.

It is undisputed that in copyright actions, "[t]he court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright." 17 U.S.C. § 501(b). One case that illustrates this proposition is *First Fin. Mktg. Servs. Group, Inc. v. Field Promotions, Inc.*, 286 F. Supp. 295, 298 (S.D.N.Y. 1968). In *First Fin.*, a plaintiff sought a declaratory judgment that he was not infringing on the defendant's copyright. The United States District Court for the Southern District of New York held that "it is familiar law that the copyright owner is an indispensable party to a suit where the validity of his copyright is in issue." *Id.* at 298. "Consequently, since the validity of the [] copyright could be affected adversely to the owner thereof, [the owner] is an indispensable party." *Id.*

Plaintiff contends that *First Fin.* is not applicable because it involves the failure to join a plaintiff to a copyright action, not a defendant. However, the plaintiff at issue

had sued for a declaration of *non-infringement*, and thus effectively was a copyright infringement defendant.

The case of *Shady Records, Inc. v. Source Enters., Inc.*, 2005 WL 14920, *16 (S.D.N.Y. Jan. 3, 2005) also explains the law as to copyright co-owners.  In that case, Shady Records, Inc. ("Shady") sued Source Enterprises, Inc. ("Source"), publisher of *The Source Magazine*, and two of its officers and directors, claiming defendants infringed its copyright.  Although the court rejected the defendant's motion to dismiss, it nonetheless noted that "joinder will be desirable where validity of the copyright is challenged such that the outcome of the litigation may permanently affect the rights of the co-owner, but not where infringement alone is alleged." *Id.* at *16.  Accordingly, *Shady* denied the motion because "this action does not call into question the underlying validity of Shady's copyright" and "there [were] no other co-owners who could have been joined in this action." *Id.*

Here, on the other hand, Count 4 for permanent injunction clearly presents a different situation than the one at issue in *Shady*.  A permanent injunction will obviously "permanently affect the rights of the co-owner [Nelstar]." *Cf. id.*  The relief sought is certainly akin to transferring the essential rights of copyright ownership from its current owners to Kernel.  Such a remedy can be imposed only against all "owners" of the copyright in question.

At the hearing held on this issue, Kernel's counsel pointed us to the case of *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007), to support the contrary position.  *Davis* merely notes that "a joint owner is not required to join his other co-owners in an action

31

for infringement.  *See* 17 U.S.C. § 501(b) (noting that a court "*may*" require the joinder . . . of any person having or claiming an interest in the copyright") (emphasis added)." This proposition does not contradict the Court's finding that Nelstar, as a co-owner of the copyright in dispute, is indispensable to an action for a permanent injunction of the work.  *Davis* suggests that a co-owner need not be joined as a plaintiff when that co-owner's work is allegedly being infringed.  In such a scenario, a permanent injunction would not affect that co-owner's copyright.  The facts of the present case, however, are distinguishable because a permanent injunction would directly affect Nelstar's ownership of "Do It."  Moreover, *Davis* does nothing to dispute the law that the court *may* require a party's joinder.  *Id.*  Thus, the general proposition of joint and several liability, along with Plaintiff's cases on this issue, are not controlling here.  Instead, the more relevant authorities dictate that a co-owner of a copyright, such as Nelstar here, satisfies the criteria under Rule 19(a) for being a necessary party.

The same is not true of the other claims relevant to the motion.  The claim for copyright infringement damages does not divest the owners of their copyright interest in the composition.  And the claim for accounting similarly does not do so, and instead merely supports the claim for damages.  Unlike the permanent injunction claim, these remedies sought in the amended complaint do not implicate the same ownership interests that may require the presence of all related parties in one action.  Once the permanent injunction claim is excised from the amended complaint, the remaining case against the named defendants is largely based upon unlawful copying, which does not give rise to necessary party concerns.  *See also Wales Indus. Inc. v. Hasbro Bradley,*

*Inc.*, 612 F. Supp. 510, 517 (S.D.N.Y. 1985) ("Absent special circumstances joinder should be required in cases challenging the validity of the copyright upon which rest the rights of the person to be joined and should not be required if the only issue is whether the defendant engaged in unlawful copying.").

### 3.   *Is Nelstar an Indispensable Party?*

After balancing the Rule 19(a)(2) factors set forth above, this Court finds that Nelstar must also be deemed indispensable to this action if all claims alleged in the amended complaint remain in the case.  To begin with, Plaintiff Kernel's interest in having its forum is minimal.  This forum was not Kernel's initial choice - Finland was. Furthermore, all defendants to this case have stipulated to jurisdiction in New York. Also, although it is true that the song was allegedly created in this forum, Kernel seeks damages for the infringement of its copyright throughout the United States, not just Florida.  Next, Nelstar has a significant interest in avoiding inconsistent relief.  In the event that Plaintiff Kernel succeeds in its claim for a permanent injunction, such a judgment would not be binding upon Nelstar.  As a result, there would be a significant risk for inconsistent judgements, since Mosley would be permanently enjoined from distributing "Do It" but Nelstar would not.  Moreover, dismissal of the permanent injunction count will not prevent Kernel from proceeding with the action.  Only the permanent injunction must be dismissed, while the damages claims may proceed. Most significantly, Nelstar's interest in the outcome of this case is compelling.  As set forth above, a permanent injunction issued against the other defendants in this case

would subject Nelstar to uncertainty as to its ability to distribute its song.  As 50% owner of "Do It," Nelstar should be a party to a suit that could control "Do It's" validity.

For the above reasons, this Court finds that the defendants would be manifestly prejudiced if a permanent injunction were issued to the named defendants in the case and not Nelstar.  Nelstar is both a necessary and indispensable party to any claim implicating the rights of copyright owners in this work.

Again, however, the only claim that raises this problem is Count 4 for permanent injunction.  As Kernel's counsel stipulated at the hearing, Kernel is prepared to dismiss that claim if the Court concludes, as it has, that Nelstar would be indispensable.  Therefore, the Court will dismiss Count 4 without prejudice and allow this case to proceed against the remaining defendants as to all other claims.

### III.  CONCLUSION

Based on the foregoing, Nelstar's Motion to Dismiss Kernel's Amended Complaint for Lack of Personal Jurisdiction over Nelstar is **GRANTED**.  All claims raised in the amended complaint against Nelstar are **DISMISSED** without prejudice. In addition, the Motion to Dismiss Count 4, for permanent injunction, as against all remaining defendants is **GRANTED**.   Count 4 is hereby **DISMISSED** without prejudice as per Rules 12(b)(7) and 19.  The motion is **DENIED** as to all the remaining claims in the amended complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida this 5th day of July, 2010.

*/s/   Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

34