## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 09-21597-CIV-TORRES

CONSENT CASE

KERNAL RECORDS OY,

      Plaintiff,

vs.

TIMOTHY Z.  MOSLEY p/k/a TIMBALAND;
*et al.*,

      Defendants.

_____/

### MEMORANDUM OPINION AND FINAL ORDER ON
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### AND PLAINTIFF'S MOTION TO AMEND

On March 31, 2011, we issued a non-final Order granting Defendants Timothy

Z. Mosley p/k/a Timbaland and Mosley Music, LLC's ("Defendants") Motion for

Summary Judgment [D.E. 137].  [D.E. 227].  The underpinnings of the ruling were our

conclusions that Plaintiff's SID file version of "Acid Jazzed Evening" ("AJE") had first

been published on the Internet and that that act constituted simultaneous publication

in the United States and other nations around the world having Internet service under

the Copyright Act of 1976, 17 U.S.C. § 501, *et seq.*  We concluded that Plaintiff's work

met the definition of a "United States work" under 17 U.S.C. § 101(1)(C) and that,

pursuant to 17 U.S.C. § 411(a), Plaintiff was required to register AJE prior to suing for

copyright infringement.  As there was no dispute that Plaintiff had failed to obtain a

copyright registration for AJE or for any claimed "sound recording" or "composition," we found that Plaintiff had not satisfied a statutory condition precedent to initiating this infringement lawsuit.  Accordingly, since Plaintiff could not initiate or maintain this action, we granted summary judgment for Defendants.

Plaintiff immediately moved for reconsideration of our ruling or, alternatively, an abeyance in order to register AJE and amend the complaint to show compliance with § 411(a).  [D.E. 230].  Before we could rule on this request, Plaintiff obtained registration for AJE and moved for leave to amend the complaint.  [D.E. 235]. Defendants oppose the amendment.

Following another thorough review of the record and the legal arguments and analyses presented by the parties, we now affirm our March 31, 2011 ruling.  We deny Plaintiff's motion to reconsider to the extent we are asked to reverse our prior ruling. We also deny Plaintiff's motion to amend the complaint.  Accordingly, we affirm our grant of summary judgment for Defendants.  This determination is final and closes the case.

## I.   BACKGROUND

The action arises from a sound recording of a composition and musical arrangement of "Acidjazzed Evening" created by Glenn Rune Gallefoss ("Gallefoss") in 2002.  Gallefoss, a citizen and resident of Norway, created AJE on a Commodore 64 computer in the form of a SID file.[1]  Gallefoss based AJE on an earlier musical

---

[1]     The Commodore 64 used a custom-designed musical synthesizer chip, called the Sound Interface Device ("SID"), to play music.  A SID file is a computer file playable on a Commodore 64 or any computer through the use of a software player that "emulates" the Commodore 64 SID sound chip.  A SID file contains all the information

arrangement created in 2000 on a different kind of computer by Janne Suni ("Suni") of Finland.

Gallefoss first authorized publication of AJE in an Australian disk magazine called *Vandalism News*, issue 39, in August 2002.  The work was not only displayed but was made available for downloading and copying, with Gallefoss' knowledge and approval.  In December 2002, AJE was posted on the High Voltage SID Collection website.

On August 16, 2007, Gallefoss transferred "all transferrable rights" to the sound recording and arrangement of AJE to Plaintiff Kernal Records Oy ("Plaintiff").  Plaintiff alleges that the sound recording and musical arrangement were copied into a new sound recording and composition called "Do It."  Defendants are the performers, writers, producers, publishers, record labels, and others associated with "Do It," who wrote, created, copied, published, licensed, distributed, manufactured and/or sold "Do It," or authorized others to do so in various media.  Plaintiff is suing for copyright infringement of sound recording, infringement of musical work, and accounting.  [D.E. 63; D.E. 108; D.E. 195].

## II.   ANALYSIS

Defendants moved for summary judgment on Plaintiff's infringement claims on the ground that Plaintiff had not obtained copyright registration for its SID file version of AJE or for any claimed "sound recording" or "composition" and therefore had failed

---

necessary to play a particular musical composition.

to satisfy the statutory preconditions of 17 U.S.C. § 411(a) for filing an infringement suit.[2]  Plaintiff claimed AJE is exempt from § 411(a) requirements.

### A.   *Legal Framework*

Section 411(a) of the Copyright Act of 1976 provides in relevant part that no suit for copyright infringement of a "United States work" may be instituted until the work has been registered with the United States Copyright Office.  17 U.S.C. § 411(a) ("no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").  For purposes of § 411, a work is a "United States work" only if,

> (1)  in the case of a published work, the work is first published –
>
> (A)  in the United States;
>
> (B)  simultaneously in the United States and another treaty party[3] or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;
>
> (C)  simultaneously in the United States and a foreign nation that is not  a treaty party; or
>
> (D) in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or

---

[2]    Plaintiff has now obtained copyright registration for AJE.  This fact does not dispose of the matter, though, for we are denying Plaintiff's motion to amend.  *See* Section D *infra*.

[3]    A "treaty party" is a "country or intergovernmental organization other than the United States that is a party to an international agreement." 17 U.S.C. § 101. The Berne Convention, more formally known as "the Convention for the Protection of Literary and Artistic Works, signed at Berne, Switzerland, on September 9, 1886, and all acts, protocols, and revisions thereto," is one such "international agreement."  *Id.*

> habitual residents of, or in the case of an audiovisual work
> legal entities with headquarters in, the United States[.]

17 U.S.C. § 101.

In 1989, the United States acceded to the Berne Convention ("Convention"), an international copyright treaty that among other things prohibits signatories from imposing copyright formalities as a condition to the protection of works of nationals of other member countries. *See generally* Christopher Sprigman, *Reform(aliz)ing Copyright*, 57 Stan. L. Rev. 485, 488 (2004).[4]  To meet obligations necessary to adhere to the Convention, the United States eliminated many of the formalities for foreign works, including the registration requirement of § 411(a).  *See, e.g., Football Ass'n Premier League Ltd. v. YouTube, Inc.* 633 F. Supp. 2d 159, 163-64 (S.D.N.Y. 2009); 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.01[A], at 7-8 - 7-9 (2011) (for non-U.S. Berne Convention authors, the formality of copyright registration is no longer a prerequisite to filing an infringement action); *see also* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988).  Thus, if AJE does not qualify as a "United States work," it is exempt from the registration requirement of § 411(a).

Defendants argue (1) that the evidence establishes that AJE was first published on the Internet in *Vandalism News* # 39 in August 2002 and (2) that publication on the

---

[4]      Article 5(1) of the Berne Convention provides that "[a]uthors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, . . . the rights specially granted to this Convention."  Berne Conv. Art. 5(1).  The Convention further specifies that "[t]he enjoyment and exercise of these rights shall not be subject to any formality."  *Id.* Art. 5(2).

Internet constitutes simultaneous publication all over the world. If both those assertions are correct, then AJE qualifies as a "United States work" under § 101(1)(C) because it was published simultaneously in the United States and (necessarily) in foreign nations that are non-treaty parties.[5]  17 U.S.C. § 101(1)(C).

Plaintiff hotly disputes Defendants' assertion that AJE was first published on the Internet. Plaintiff insists that when Gallefoss testified AJE was first published on a "disk magazine," he was referring to a "computer disk containing a magazine," i.e., a physical computer disk. [D.E. 172 at 4]. Plaintiff claims that the evidence shows that AJE was not posted on the Internet until it appeared on the High Voltage SID Collection website, more than three months after it was published in *Vandalism News*. At the very least, Plaintiff contends that the manner of first publication is in dispute and precludes entry of summary judgment on the issue.

Plaintiff also disagrees that Internet publication equates to simultaneous worldwide publication. Plaintiff urges us to follow *Moberg v. 33T LLC*, 666 F. Supp. 2d 415 (D. Del. 2009), a decision from the District of Delaware that is the only other published opinion that has addressed this particular issue. Judge Hillman held in that case that publication of photographs posted on a German website did not amount to simultaneous publication in the United States and Germany and therefore, because the photos did not qualify as "United States works," the plaintiff did not have to satisfy

---

[5]      AJE does not qualify as a "United States work" under § 101(1)(B) because at the time of first publication in 2002, Australia's term of copyright protection (the life of the author plus 50 years) was not the same or longer than the term provided in the United States (the life of the author plus 70 years).  [*See* D.E. 172 at 11-12].

U.S. registration requirements before suing for copyright infringement.  666 F. Supp. 2d at 422, 424.

The issues presented for our determination in this case are (1) whether AJE was first published on the Internet and if so, (2) whether that act constituted simultaneous worldwide publication which would make AJE a "United States work" subject to § 411(a)'s registration requirements.  We answer both questions in the affirmative.

### B.   *First Publication*

Defendants argue that AJE was first published on the Internet.  Plaintiff claims first publication was on a physical computer disk.  At the very least, Plaintiff posits that if we view the evidence in the light most favorable to Plaintiff as the non-moving party, we must find that there are material facts in dispute with regard to this issue.

We disagree and affirm our prior ruling.  We have thoroughly reviewed the evidence and conclude the evidence shows that first publication was on the Internet.  Moreover, Plaintiff has not offered any credible evidence that creates a dispute about this.

Defendants requested in discovery that Plaintiff produce all documents that evidenced the date, manner and place of first publication of AJE.  In response, Plaintiff produced a printout of a computer screen showing the online image of *Vandalism News* # 39.  [D.E. 201-1].  The top of the printout displays the following tabs:  "Log In," "Register," "Browse," "Help," "Statistics," "Forums," "RSS," and "Donate." The printout displays other interactive features including "User rating," "SIDS used in this release" (listing Gallefoss' Acid Jazz SID), "Download," and "User Comment."  The printout indicates a "Release Date" of August 10, 2002.

The printout was the only evidence Plaintiff produced in response to the defense's specific request for all proof of first publication. Plaintiff did *not* produce a physical copy of a magazine or computer disk, explain why it could not produce any physical evidence after all these years, or provide any tangible evidence suggesting that what appeared to be an online publication was in fact not.

Importantly, Gallefoss confirmed in his February 2010 deposition that *Vandalism News* was an online magazine:

Q:   Now, you indicated that the first publication of your version of "Acid Jazz" *was posted on this Australian* –

A:   Disk magazine.

Q:   *– online magazine, correct*?

A:   *Yeah, that's the first* – I gave it to the disk magazine, yes, so it was first used in that disk magazine.

Q:   And then after that you posted it on this High Voltage site; is that correct?

A:   I didn't post it.  Someone else did.

Q:   Who did that?

A:   I don't know.  Maybe the people who work for the High Voltage SID collection.

Q:   *And they may have just gained access to it from the online magazine*?

A:   *Yeah.*

Q:   And then posted it themselves?

A:   They took it from the disk magazines.

[D.E. 138-1 at 8 (emphasis supplied)].

Plaintiff claims that based on this limited exchange, the record is unclear as to whether *Vandalism News* was an online magazine.  Plaintiff complains that defense counsel never asked obvious follow-up questions such as "what is a disk magazine?" and "was the disk magazine published online in 2002?"

But we find Gallefoss' testimony clear enough.  He agreed with defense counsel that the first publication of AJE was posted on an online magazine.  If the testimony were inaccurate or unclear, it was incumbent upon Plaintiff's counsel to clarify the witness' testimony on this important point.[6]

Plaintiff has attempted to create an issue of fact with Gallefoss' sworn declaration from May 2010 (a few months after his deposition), submitted in opposition to Defendant's motion for summary judgment.  There, Gallefoss stated in relevant part: "I authorized publication of my version of [AJE] *in a magazine published on a computer*

---

[6]      Janni Suni also testified about his familiarity with *Vandalism News* as an online magazine:

Q:      Are you familiar with *an Internet publication called Vandalism News*?

A:      Yes.

* * *

Q:      All right.  Now, *this online magazine*, what is the focus of that magazine?

* * *

A:      Well, it's the demoscene.  It's history and publications and also displays interviews on people involved in the demoscene.

[D.E. 202-1 at 3-4 (emphasis supplied)].

*disk* in Australia called *Vandalism News*, issue 19, in August 2002." [D.E. 143-4 at 4 ¶ 23 (emphasis supplied)].

Plaintiff asserts this statement is consistent with and clarifies Gallefoss' earlier deposition testimony regarding the manner of first publication.  But significantly, Gallefoss failed to explain in his declaration why he admitted in deposition that AJE was first published *online*.  Nor did he explain in the declaration how "disk magazine" could be synonymous with "computer disk" when in deposition he had been discussing an *online* magazine.

Plaintiff also contends that Gallefoss' declaration that publication was on a computer disk is consistent with his deposition testimony regarding the small size of the SID file.  Gallefoss testified that in creating AJE, he attempted "to make this sound, this musical composition as small as possible, . . ., so it would fit in the disk magazine demonstration." [D.E. 171-1 at 14].  Plaintiff argues that the size of the file would have mattered to Gallefoss only if the file were intended for inclusion on a computer disk where space is at a premium, whereas the size of the file would have been irrelevant for purposes of internet publication.  Plaintiff attempts to bolster its position here by citing to articles and other supplemental information concerning space on disks, the nature of disk magazines, and online archives, none of which is properly in evidence.  We find that Plaintiff's assertion that Gallefoss meant "physical computer disk" when he said "disk magazine" is unsupported by the record.

To the extent that Gallefoss' declaration conflicts with his prior deposition testimony on this issue, we will not consider it.  The deposition testimony was clear that first publication was online; Plaintiff's counsel could have questioned Gallefoss to

clarify his position on this important point but did not; Gallefoss never intimated during the deposition that the disk magazine was a physical computer disk; and the only tangible evidence produced by Plaintiff in direct response to a discovery request on the issue of first publication supports the deposition testimony that it was online. "[W]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1381 (11th Cir. 2010); *see also Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658-89 (11th Cir. 1984) (affirming the district court's grant of summary judgment for the defendants upon a finding that the plaintiff's affidavit was a sham and did not serve to create a genuine issue of material fact as to require submission to a jury).

Based on the foregoing, we conclude that Defendants have established that AJE was first published on the Internet while Plaintiff has failed to present any competent evidence to the contrary that might to create a genuine issue of fact.  We have not weighed the evidence for there was none to weigh.  Accordingly, we affirm our prior ruling on this point.

### C.   *United States Work*

We also ruled in the March 31, 2011 Order that Plaintiff's posting of AJE on the Internet constituted a "publication" under § 101 and that publication on the Internet constituted simultaneous publication in the United States and other nations around the world that have Internet service.  Thus, we concluded that AJE, which was first

published on a website in Australia, was also simultaneously published in the United States and other nations with Internet service that are not treaty nations, making AJE a "United States work" under § 101.

Plaintiff urges us to follow *Moberg* in which Judge Hillman held that "as a matter of U.S. statutory law," photographs posted on a website in German "were not published simultaneously in the United States." 666 F. Supp. 2d at 422.

In *Moberg*, a plaintiff-photographer living in Sweden created a series of photographs that were first published on a German website, blaugallery.com, an on-line art shop that offered copies of the works for sale. 666 F. Supp. 2d at 417-418. A few years later several of the photographs were posted on a few U.S. websites. *Id.* at 418. The plaintiff sued in United States district court, alleging infringement under U.S. copyright law. *Id.*

The plaintiff had not registered his photographs in accordance with the provisions of the Copyright Act. *Id.* at 419. The defendants contended, as they do in our case, that the plaintiff's works were "United States works" because, although they were created outside the United States, their publication on a German website, i.e., the Internet, constituted simultaneous publication in Germany and in the United States. *Id.*

Judge Hillman rejected the notion that posting a photograph on a foreign country's website results in publication simultaneously in the United States so as to transform it into a "United States work." *Id.* at 419-420. He opined that an acceptance of the defendants' position would "overextend and pervert the United States copyright law, and would be contrary to the Berne Convention." *Id.* at 420. In analyzing these

issues of first impression, Judge Hillman found highly persuasive Professor Thomas Cotter's law journal article, *Toward a Functional Definition of Publication in Copyright Law*, 92 Minn. L. Rev. 1724 (2008), which examined the interrelation between the Copyright Act, the Convention, and the Internet, and what constitutes "publication." *Id.*

### 1.   *Publication Via Internet*

Judge Hillman did *not*, however, decide whether posting a work on the Internet constituted publication under § 101.  He deemed it unnecessary "to delve into yet another unsettled issue[] because[,] even assuming that the German website 'published' plaintiff's photographs, [] as a matter of U.S. statutory law the photographs were not published simultaneously in the United States."  *Id.*

We must address the issue, however.  Defendants contend and we agree that posting AJE on the Internet was a publication under § 101.  [D.E. 137 at 5-6].  Plaintiff disagrees, reiterating that the issue is unsettled and citing to *Moberg* and Professor Cotter's article.  [D.E. 172 at 10-11].

The term "publication" is defined in the Copyright Act as:

the *distribution of copies* or phono records *of a work to the public by sale or other transfer of ownership*, or by rental, lease, or lending.  The *offering to distribute copies* or phono records *to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication*.  A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101 (emphasis supplied).  "[A] *sine qua non* of publication should be the acquisition by members of the public of a possessory interest in tangible copies of the work in question."  1 *Nimmer on Copyright* § 4.07[A], at 4-43.

This principle was explored in *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002). There, the court held that the source code for the plaintiff's website was "published" for copyright purposes when the website went "live." *Id.* at 402. The court cited with favor several decisions in which the posting of music files, software, and photographs on webpages was found to have violated the copyright holders' exclusive distribution rights under 17 U.S.C. § 106 and, by implication, amounted to publication. *Id.* at 401 (citing *e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) (Napster users who uploaded music files to the Internet for others to copy violated the copyright holder's exclusive distribution right); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 939 F. Supp. 1032, 1039 (S.D.N.Y. 1996) (defendant's unauthorized uploading of copyrighted pictorial images to a website, from which images were downloaded to and stored on the computers of subscribers to the defendant's internet service, constituted distribution); *Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993) (defendant's unauthorized uploading of copyrighted images to a subscription bulletin board from which the images were downloaded by bulletin board subscribers constituted an infringement of the plaintiff's exclusive display and distribution rights)).

The determinative factor in those cases, *Getaped.com* explained, was "the ability of the Internet user to download a file containing copyrighted work and thereby gain control of it, that is, gain a proprietary or possessory interest in the copyrighted work." *Id.* (citing *Nimmer on Copyright*). The *Getaped.com* court thus differentiated between viewing a painting or watching a play on the one hand, and accessing a webpage on the

other: in the latter, the user not only viewed the webpage but could also view and copy the code used to create it. *Id.* at 402. The court reasoned:

> . . . merely by accessing a webpage, an Internet user acquires the ability to make a copy of that webpage, a copy that is, in fact, indistinguishable in every part from the original. Consequently, when a website goes live, the creator loses the ability to control either duplication or further distribution of his or her work. A webpage in this respect is indistinguishable from photographs, music files or software posted on the web - all can be freely copied. Thus, when a webpage goes live on the Internet, it is distributed and "published" in the same way the music files in *Napster* or the photographs in the various *Playboy* decisions were distributed and "published."

*Id.*

We think the same rationale applies here. AJE was not merely viewable (audible) on the Internet (as was the case with the photographs in *Moberg*), it was also available for downloading and copying (which was not a factor in *Moberg*). Gallefoss knew that anyone who accessed *Vandalism News* # 39 would be able to download and copy his work, and he did not object. From the moment it was posted online, AJE could be reproduced, distributed, or otherwise manipulated. Gallefoss lost the ability to control his work as members of the public acquired (or in theory had the ability to acquire) a possessory interest in AJE.

In posting AJE online where it could be downloaded and copied, Gallefoss was distributing or offering to distribute his work to the public. *See* 1 *Nimmer on Copyright* § 4.07[A], at 4-43 ("[I]t would then seem proper to conclude that . . . no publication should be held to occur unless the public obtain a possessory right in tangible copies of the work for only then are significant economic rewards [to the author] attainable. . . . [U]nless members of the public are able to obtain such a possessory right, the

author has not lost the physical ability to control the dissemination and enjoyment of his work, and hence, the work has not, in a meaningful sense, been acquired by the public."). This constituted "publication" as defined in § 101.[7]

### 2.    _Simultaneous Global Publication_

We next concluded that publishing AJE on a website in Australia was an act tantamount to global and simultaneous dissemination of the work, rendering it a "United States work" subject to § 411(a)'s registration requirement.

Judge Hillman articulated three reasons for rejecting the proposition that publishing a work on the Internet "automatically, instantaneously, and simultaneously causes that work to be published everywhere in the world." _Moberg_, 666 F. Supp. 2d at 422-23.

First, he concluded that such a result would subject every copyright holder to the formalities of the copyright laws of every country that has such laws which "is contrary to the purpose of the Berne Convention." 666 F. Supp. 2d at 422. Next, Judge Hillman reasoned that transforming the plaintiff's photographs into "United States works" "simply by posting them on the internet would allow American citizens to infringe on

---

[7]    Professor Cotter outlined the "controversy" surrounding, and for policy-based reasons expressed skepticism with, the notion that materials transmitted over the Internet necessarily are published. Cotter _supra_ at 1767-70, 1785-88. But he also acknowledged that "[c]hanging the facts [surrounding an author's uploading his materials onto his website] may result in the transmissions appearing more or less like a publication." _Id._ at 1768. He hypothesized a situation where an author uploaded materials to his website then authorized users to make copies of the material. _Id._ "This might seem more like a conventional publication, because the end result is the (at least offered) release of tangible copies to the general public." _Id._ In our case, as noted, AJE was not merely transmitted over the Internet, it was downloadable and copyable which allowed the public to acquire a possessory interest in tangible copies of the work.

foreign copyrighted works without fear of legal retribution, since the majority of foreign works are never registered in America." *Id.* at 423.   This would be contrary to the Convention's stated purpose of forming "a  Union for the protection of the rights of authors in their literary and artistic works." *Id.* (citing Berne Conv. Art. 1).   Finally, Judge Hillman determined that U.S. copyright laws, in accord with the Convention, currently protect foreign works in the United States "without requiring the artists to undertake any formalities in the United States." *Id.*   He concluded that requiring artists who posted their work on a foreign country's website to comply with U.S. copyright formalities would be contrary to that law. *Id.*

We respectfully decline to follow the reasoning of *Moberg*.   As indicated in our prior Order, Judge Hillman's contextual and policy-driven analysis is reasonable and sound but is, in our opinion, wholly untethered to the actual statutory and treaty language that governs this dispute.   We need not spend much time examining the interrelationship between U.S. copyright law and the Berne Convention because a simpler approach is available and dispositive.

We begin our analysis with the copyright statute.   "[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).   "As a basic rule of statutory interpretation, we read the statute using the normal meanings of its words." *Consolidated Bank, N.A. v. Office of Comptroller of Currency*, 118 F.3d 1461, 1463 (11th Cir. 1997).   We "must assume that Congress intended the ordinary meaning of the words it used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." *Id.*   We look beyond the plain language of a statute

only when it is unclear or ambiguous, when Congress has clearly expressed a legislative intent to the contrary, or when an absurd result would ensue from adopting the plain language interpretation. *Id.* at 1463-64. *See also, Grabein v. Jupiterimages Corp.*, No. 07-22288-CIV, 2008 WL 2704451, at * 4 (S.D. Fla. July 7, 2008) ("When the import of words Congress has used is clear . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language), *aff'd and adopted*, No. 07-22288-CIV-GRAHAM/TORRES (S.D. Fla. July 25, 2008).

A "United States work" is defined in the copyright statute as a work that "was first published . . . simultaneously in the United States and a foreign nation that is not a treaty party." 17 U.S.C. § 101(1)(c). We have already determined that AJE was "published" on the Internet in Australia. Was it published simultaneously in the United States and elsewhere?

"In the absence of a statutory definition of a term, we look to the common usage of words for their meaning." *Consolidated Bank*, 118 F. 3d at 1464. We must consider words in the context of the statute as a whole, and dictionary definitions can also provide guidance. *See Grabein*, 2008 WL 2704451, at *5.

"Simultaneous" is defined in relevant part as "existing or occurring at the same time: exactly coincident." Merriam-Webster Dictionary online, http://www.merriam-webster.com/dictionary/simultaneous (June 1, 2011). Absent evidence of Congressional intent to the contrary, the term "simultaneously" should be given its ordinary and plain meaning.

There can be little dispute that posting material on the Internet makes it available at the same time – simultaneously – to anyone with access to the Internet.[8] There is nothing in the text of the statute to suggest that Congress intended to except works published on the Internet from the phrase "first published . . . simultaneously" or that certain works should be excluded from the definition of "United States work" based solely on the manner in which they are published.  Nor has Plaintiff identified

---

[8]      In outlining the history and basic technology of the Internet (as a backdrop to resolving constitutional challenges to provisions of a law intended to protect minors from harmful materials on the Internet), one district court described the Internet as a "giant network which interconnects innumerable smaller groups of linked computer networks."  *American Civil Liberties Union v. Reno*, 929 F. Supp. 824, 830 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844, 849-53 (1997) (summarizing the district court's findings regarding the Internet).  The court continued:

> Some of the computers and computer networks that make up the Internet are owned by governmental and public institutions, some are owned by non-profit organizations, and some are privately owned.  The resulting whole is a decentralized, global medium of communications - or "cyberspace" - that links people, institutions, corporations, and governments around the world.  The Internet is an international system. *This communications medium allows any of the literally tens of millions of people with access to the Internet to exchange information.  These communications can occur almost instantaneously, and can be directed either to specific individuals, to a broader group of people interested in a particular subject, or to the world as a whole.*

*Id.* at 831 (emphasis supplied).

The most well-known category of communication over the Internet, the "World Wide Web," "is a series of documents stored in different computers all over the Internet."  *Id.* at 836.  Most documents on the Web contain "links" which are short sections of text or image that refer to another document.  *Id.*  "[L]inks from one computer to another, from one document to another across the Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique. *The Web was designed with a maximum target time to follow a link of one tenth of a second.*"  *Id.* at 836-37 (emphasis supplied).

anything in the statutory provisions or legislative history that suggests Congress intended such an exception.

If Congress had intended to exclude works published on the Internet from the definitions of "United States work" or "publication" in § 101, it easily could have done so. *See, e.g., Consumer Product Safety Comm'n*, 447 U.S. at 109 (Congress could have included the disclosure of information in response to a FOIA request in the list of exceptions set out in the Consumer Product Safety Act, but it did not). The copyright provisions at issue here were modified in 1998 as part of the Digital Millennium Copyright Act. *See* Pub. L. 105-304, 112 Stat. 2860, § 102(a)(2) (1998) (amending the definition of "United States work" to its current form) & § 102(d) (same for registration requirements for foreign works). We must presume that Congress was fully aware of the Berne Convention and other international treaties as well as the global nature of the Internet when it enacted the 1998 Act. Yet it evidenced no intent to treat Internet-published works differently from works published in another manner.

Judge Hillman's objections to the proposition that publication on the Internet constitutes simultaneous global publication for copyright purposes are policy-driven. They reflect a deference to certain goals of the Berne Convention at the expense of clear statutory language. But "Congress passed the Berne Convention Implementation Act of 1998 with explicit direction to courts that they should apply the law that it drafted, not look to vindicate propositions of the Berne Convention directly." 2 *Nimmer on Copyright* § 7.16[B][6][e], at 7-190.8(2) (criticizing the decisional approach taken in *Moberg*; 1 *Nimmer on Copyright* § 1.12[A], at 1-167 - 1-169 (discussing and citing to provisions in the Berne Convention Implementation Act, Pub. L. 100-568, 102 Stat.

2853, that were designed to forestall treaty self-execution). *See also Football Ass'n*, 633 F. Supp. 2d at 162-64 (rejecting the plaintiff's claim that 17 U.S.C. § 412 excuses foreign works from the registration requirement in order to obtain statutory damages; there is no exception for foreign works in the statute, Congress did not intend an exception, requiring foreign works to meet this requirement would not violate international copyright and intellectual property treaties to which the United States is bound, and "[e]ven if Section 412 were in conflict with the Berne Convention, Section 412 would be binding . . . [b]ecause the Berne Convention has no effect on U.S. law unless Congress so provides . . ."). When the statute is clear, as it is here, we need go no further in our analysis.

Turning to *Moberg*, we respectfully disagree with some of the premises on which Judge Hillman's analysis appears to have been based. For instance, he stated that this country's copyright laws, in accord with the Convention, protect foreign works "without requiring the artists to undertake any formalities in the United States." 666 F. Supp. 2d at 423. But not all formalities for foreign authors have been dispensed with. While registration of foreign works as a precondition to bringing an infringement suit is no longer required, registration is still required for foreign authors to gain the procedural benefits of a *prima facie* presumption of the validity of a copyright, statutory damages, and attorney's fees under the Act. *See* 2 *Nimmer on Copyright* § 7.01[B], at 7-11 - 7-12; 17 U.S.C. § 410(c) (registration required for presumption of validity); 17 U.S.C. § 412 (registration required for award of statutory damages and attorney's fees); *see also, e.g., Football Ass'n*, 633 F. Supp. 2d at 162 (17 U.S.C. § 412 requires registration before party can obtain statutory damages for both domestic and foreign works). And of

course, a foreign author wishing to avail himself of U.S. copyright laws must comply with various requirements for filing a lawsuit in federal court.

Judge Hillman also opined that transforming Internet-posted works into "United States works" would allow American citizens to infringe on foreign-copyrighted works with impunity, since the majority of foreign works are not registered in this country. 666 F. Supp. 2d at 423.  But "registration is not a condition of copyright protection." 17 U.S.C. § 408(a).  There is no loss of *copyrights* by virtue of publishing a work on the Internet, irrespective of registration.  Registration is simply a prerequisite to bringing a claim after infringing activity has occurred.  17 U.S.C. § 411(a); *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1241-42 (2010).

Similarly, Judge Hillman expressed concern that if publishing a work on the Internet automatically and simultaneously caused the work to be published everywhere in the world, an artist would be required "to survey all the copyright laws throughout the world, determine what requirements exist as preconditions to suits in those countries should one of its citizens infringe on the artist's rights, and comply with those formalities, all prior to posting any copyright image on the Internet."  666 F. Supp. 2d at 422-23.  The Berne Convention, he reasoned, was formed in part to prevent exactly such a result.  *Id.* at 423.   But as we just noted, registration is not a prerequisite to copyright protection.  Registration need not be in place before a work is published or before allegedly infringing activity has occurred in order for an artist to later enforce his copyrights.

We hold that publishing AJE on a website in Australia was an act tantamount to global and simultaneous publication of the work, bringing AJE within the definition

of a "United States work" under § 101(1)(C) and subject to § 411(a)'s registration requirement.    Gallefoss elected to publish AJE on the Internet and the legal consequences of that decision must apply.  Plaintiff was therefore required to register AJE prior to seeking judicial enforcement of its copyright rights.

### D.   *Motion to Amend Complaint*[9]

Having now obtained copyright registration for the sound recording and musical composition of AJE, Plaintiff moves to amend the complaint to add this allegation.  As stated earlier, Plaintiff applied for and then obtained registration after March 31, 2011, after we determined that AJE was subject to § 411(a)'s registration requirement, a precondition precedent to filing suit that Plaintiff failed to meet.  Plaintiff claims the proposed amendment does not change any facts or legal theories or add a new cause of action.  Plaintiff maintains that amendment should be allowed in the interest of justice, particularly here where Plaintiff was under a good faith (though mistaken) belief that registration was not required.

When amendment to a complaint is sought after the deadline established in a scheduling order, as is the case here,[10] the plaintiff must first demonstrate good cause

---

[9]    Plaintiff initially asked that we hold entry of our Final Order in abeyance so that it could apply for and obtain a copyright certificate.  [D.E. 230].  That goal has been achieved and the abeyance request is moot.

[10]    The deadline for amending the pleadings passed long ago.  The original scheduling order issued in this case set December 21, 2009 as the deadline to amend the pleadings.  [D.E. 34].  On February 9, 2010, Plaintiff amended the complaint following a ruling on motions to dismiss by the then-presiding judge, the Honorable Donald L. Graham.  [D.E. 61; D.E. 63].  Following our May 10, 2010 ruling on the next round of motions to dismiss [D.E. 108], Defendants filed their answers to the amended complaint on May 26, 2010.  [D.E. 127].  Pursuant to the scheduling order, which was amended on several occasions, the discovery period ultimately closed on May 14, 2010

under Fed. R. Civ. P. 16 before a court will consider whether amendment is proper under Fed R. Civ. P. 15(a).  *See, e.g., Smith v. School Bd. of Orange County*, 487 F.3d 1361, 1366 (11th Cir. 2007) (citing *Sosa v. Airprint Sys., Inc.*, 1418, 1419 (11th Cir. 1998)); Fed. R. Civ. P. 16(b)(4) (scheduling order may be amended only for good cause and with the judge's consent).

To show good cause for an untimely amendment, a plaintiff must demonstrate diligence.  *See e.g., Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (Rule 16's "good cause" standard precludes modifying the scheduling order unless the schedule cannot be met despite the diligence of the party seeking the extension); *Auto-Owners Ins. Co. v. Ace Elec. Serv., Inc.*, 648 F. Supp. 2d 1371, 1375 (M.D. Fla. 2009) (the key to establishing good cause is to demonstrate diligence). Diligence is evaluated by considering the following factors:  (1) whether the plaintiff failed to ascertain facts prior to filing the complaint and to acquire information during the discovery period; (2) whether the information supporting the proposed amendment was available to the plaintiff; and (3) whether even after acquiring the information the plaintiff delayed in seeking the amendment.  *Auto-Owners*, 648 F. Supp. 2d at 1375.

Plaintiff claims it has demonstrated diligence and established good cause for the amendment.  First, Plaintiff states there is no information it could have obtained prior to filing the complaint or during discovery that would have made this amendment necessary.  From the beginning of the case, Plaintiff has taken the position that AJE

---

and motions for summary judgment were filed on May 28, 2010.  [D.E. 110; D.E. 122]. Plaintiff's motion to amend was filed nearly one year later, on May 5, 2011 [D.E. 235], after we granted summary judgment for Defendants on the registration issue.

was not a "United States work" and therefore not subject to § 411(a)'s registration requirement. [D.E. 1; D.E. 63]. Meanwhile, Plaintiff complains, Defendants did not raise the issue of lack of copyright registration until late in the case, in their Answers which were filed after several motions to dismiss had been resolved, after the close of discovery, and just days before the summary judgment deadline.

Plaintiff also argues that the information on which it bases its amendment – our determination that AJE was first published on the Internet simultaneously in the United States and around the world – was not available until March 31, 2011. Plaintiff states that once we ruled, it immediately applied for registration and thereafter, immediately upon receiving its registration certification, filed the pending motion to amend.

We reject Plaintiff's argument that it could not have anticipated a possible need for registration prior to our March 31, 2011 ruling. Plaintiff was on notice nearly a year earlier that copyright registration (or lack thereof) was an issue in the case. Specifically, in May 2010 Defendants raised lack of copyright registration as a defense in their Answers. [D.E. 127 at 10]. Defendants then argued in their summary judgment papers, also filed in May 2010, that AJE was published online, was a "United States work" subject to the § 411(a) precondition for filing suit, and that *Moberg* should not control our resolution of the issue. [D.E. 137 at 2-12]. Even if registration was not an issue in the case before May 2010, these filings injected it front and center. Plaintiff had ample opportunity between May 2010 and March 2011 to seek registration and

amendment to the complaint.[11]  *See, e.g., Frankel v. Stein & Day, Inc.*, 470 F. Supp. 209, 212 (S.D.N.Y. 1979) (after defendant raised lack of copyright registration in its motion for summary judgment, plaintiff immediately complied with the registration requirements; court allowed plaintiff to amend the complaint, noting that the defendant did not object to the procedure).

We do not put much stock in Plaintiff's claim that it could not possibly have anticipated that we might rule differently than Judge Hillman did in *Moberg*.  The issues raised in our two cases was and remains unsettled.  Judge Hillman noted the issues were of first impression.  *Moberg*, 666 F. Supp. 2d at 417.  Professor Cotter noted throughout his law article that the question of whether Internet transmission constituted publication for copyright purposes was an unsettled one and could be resolved either way.  *E.g.*, Cotter *supra* at 1785 ("as a textual matter, the question of whether an author who transmits her work over the Internet has effected a publication could be resolved either way, depending on whether the temporary RAM copy that a user's computer necessarily makes whenever the user accesses a website that incorporates the work is considered a tangible copy."); *id.* at 1786 ("Unfortunately, the policy considerations [of equating transmission with publication] do not all point unambiguously in one direction."); *id.* at 1788 ("On balance, despite some common-sense appeal to the notion that works transmitted over the Internet are necessarily published, and despite a plausible textual basis for reaching this result, it is hardly obvious that this result would be desirable.").

---

[11]     As we now know, Plaintiff could have obtained registration within a matter of weeks.

Finally, and significantly, *Moberg*, the sole published decision on this issue, is from a district court in another circuit and clearly not binding on us.  Plaintiff's claim that it could not have anticipated we would reach a different conclusion than Judge Hillman rings hollow.

Consequently, we find that Plaintiff has not identified any facts or new information it could not otherwise have discovered that justify an amendment of the complaint at this late stage in the proceedings.  We will not ascribe bad faith to Plaintiff for failing to seek registration earlier in the case.  Plaintiff made a calculated decision not to do so even though the issue was contested.  Plaintiff's decision to hedge its bet supports our conclusion that Plaintiff has not met the good cause standard under Rule 16(b)(4) for a tardy amendment of the pleadings.

Even if Plaintiff could demonstrate good cause for seeking this amendment after summary judgment was granted, it still must satisfy Rule 15 which permits amendment by leave of court or by written consent of the adverse party.  Fed. R. Civ. P. 15(a)(2).  As consent has not been granted, Plaintiff seeks leave of court.

Rule 15(a) provides that leave to amend shall be "freely given when justice so requires."  *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("this mandate is to be heeded").  Factors to consider when evaluating a motion to amend include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and the futility of the amendment.  *Id.*  Although a district court has discretion to grant an amendment, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion."  *Id.*

Plaintiff cites a number of copyright infringement cases in which a plaintiff who failed to meet the § 411(a) registration requirement prior to suing for infringement, but then subsequently obtained registration for the infringed work, was granted leave to amend the complaint accordingly.  None of those cases are persuasive.  None display a fact pattern similar to ours, where Plaintiff is attempting to amend the complaint to allege copyright registration when registration was not even sought until *after* summary judgment was granted for Defendants on the issue.

For instance, Plaintiff cites *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1488-89 (11th Cir. 1990), where a plaintiff applied for copyright registration but two months later sued for infringement even though the registration had not been issued.   Eight days later the district court dismissed the complaint for lack of registration.  *Id.* at 1489.  Seventeen days later, on the same date that the plaintiff received its copyright registration, it moved to amend the complaint to allege the registration.  *Id.*  The court allowed the amendment notwithstanding the defendant's challenge on jurisdictional grounds.[12]  *Id.*

The Eleventh Circuit concluded that the trial court had erred in allowing the amendment because at that juncture the court was without jurisdiction to do so.  *Id.* The proper way to proceed would have been for the plaintiff to file a new lawsuit as contemplated by the trial court which had expressly dismissed the complaint without prejudice so that the plaintiff could re-file once registration was obtained.  *Id.*

---

[12]      The Supreme Court recently decided in *Reed Elsevier* that § 411(a)'s registration requirement was a precondition to filing an infringement suit and nonjurisdictional.  130 S. Ct. at 1241.

However, the Eleventh Circuit concluded that it was "too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." *Id.* (internal citation omitted). "Except for the technical distinction between filing a new complaint and filing an amended complaint, the case would have been properly filed." *Id.* Additionally, the court noted that the defendant was not prejudiced by the error. *Id.*

We are well past the stage of the case at which the *M.G.B. Homes* judge allowed the amendment. There, the plaintiff's claims were dismissed shortly after the action was filed. Registration had been sought two months prior to filing suit, and registration was obtained shortly after the case was dismissed. Further, when the court dismissed the case, it anticipated a refiling. That scenario is in stark contrast with ours, where summary judgment motions were briefed, argued, and ruled upon, and only then did Plaintiff apply for and obtain registration.

*M.G.B Homes* and the other infringement cases cited by Plaintiff involve plaintiffs who obtained their registrations *before* the courts had issued their final rulings on the pleadings. *See, e.g., Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 363-64 (5th Cir. 2004) (plaintiff filed an infringement action four days before the Copyright Office received its application, deposit, and fee, all of which the plaintiff had mailed on the same day it filed suit[13]); *Identity Arts v. Best Buy Enter.*

---

[13]     The Fifth Circuit requires only that the Copyright Office receive a copyright registration application, deposit, and fee before a plaintiff may sue for infringement. *Positive Talk*, 394 F.3d at 365. The Eleventh Circuit, on the other hand, requires that registration have occurred before suit may commence. *M.G.B. Homes*, 903 F.2d at 1488 & n. 4.

*Servs., Inc.*, Nos. C 05-4656 PJH, C 06-1631 PJH, 2007 WL 1149155, at * 6 - *7 (N.D. Calif. April 18, 2007) (plaintiff obtained registration prior to filing a subsequent amended complaint); *Historical Truth Prods., Inc. v. Sony Pictures Entertainment, Inc.,* No. 93 Civ. 5529 (MBM), 1995 WL 693189, at * 6 (S.D. N.Y. Nov. 22, 1995) (plaintiff did not register its copyrighted works until approximately one year after filing its complaint for infringement but cured the defect prior to the court's ruling on summary judgment); *Frankel,* 470 F. Supp. at 212 (after the defendant raised lack of copyright registration in its motion for summary judgment, the plaintiff immediately complied with the registration requirement, and the defendant did not object to the amendment).

All of those cases are factually distinguishable from our case, where registration was sought and obtained *after* the Court had ruled for Defendants.  Moreover, there are a number of infringement cases in which the registration requirement was strictly construed, resulting in dismissal because the plaintiff had not satisfied the precondition of registration before initiating suit.  *See, e.g., Sony/ATV Music Publ'g LLC v. D.J. Miller Music Distribs., Inc.*, No. 3:09-cv-01098, 2010 WL 3872802, at * 4 (M.D. Tenn. Sept. 28, 2010) (motion to dismiss infringement claims granted even though the plaintiff obtained registration after lawsuit filed; § 411(a) is "clear that copyright registration is necessary before remedies for copyright infringement can be sought by filing a lawsuit in federal court."); *Business Audio Plus, L.L.C. v. Commerce Bank, NA*, No. 4:10CV2064 JCH, 2011 WL 250670, at * 2 (E.D. Mo. Jan. 26, 2011) (dismissing infringement claim for failure to allege or demonstrate the existence of a valid copyright registration, thereby failing to comply with the statutory precondition of registration); *Treadmilldoctor.com, Inc. v. Johnson*, No. 08-2877, 2011 WL 1256601,

at * 4 - * 6 (W.D. Tenn. March 31, 2011) (dismissing infringement claims where the plaintiff failed to satisfy the registration requirement of § 411(a), a statutory "precondition" to suing for copyright infringement).

In a broader sense, there is ample caselaw justifying the denial of a motion to amend that is filed after summary judgment has been granted for the defendant. *E.g.,* *Diersen v. Chicago Car Exchange*, 110 F.3d 418, 489 (7th Cir. 1997) (district court did not abuse its discretion in denying motion for leave to amend complaint where motion was not filed until after the court had granted the defendant's motion for summary judgment; the proposed amendment could and should have been suggested much earlier in the case, and allowing the amendment would have prolonged the litigation); *Key Airlines, Inc. v. National Mediation Bd.*, 745 F. Supp. 749, 751-52 (D.D.C. 1990) (denial of leave to amend that post-dated summary judgment was justified where the plaintiff made a tactical decision not to present the newly asserted claim at an earlier, more appropriate stage of the litigation).  As the Tenth Circuit stated in *Pallottino v. City of Rio Rancho*, 31 F.3d 1023 (10th Cir. 1994), where the plaintiff attempted to amend his complaint in order to advance a new theory after his primary theory had been dismissed:

> A busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.  Liberality in amendment is important to assure a party a fair opportunity to present his claims and defenses, but "equal attention should be given to the proposition that there must be an end finally to a particular litigation." [Citation omitted.] . . . Much of the value of summary judgment procedure in the cases for which it is appropriate . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back along thereafter and fight on the basis of some other theory.

*Id.* at 1027 (citation omitted). *Cf. Oravec*, 527 F.3d at 1231-32 (plaintiff failed to show the requisite level of diligence in pursuing infringement claim when he moved to amend 20 months after the original complaint was filed, more than a year after expiration of the deadline for amending the pleadings, and six weeks before trial; although plaintiff claimed he was not aware of a jurisdictional issue concerning his copyrights until the trial court raised the issue at a summary judgment hearing, "the fact that Oravec or his counsel misunderstood the scope of legal protection available for [certain] works does not constitute good cause" and in any event, the issue had been raised three months earlier in defendants' summary judgment motion).

We also find that Defendants would be prejudiced by allowing an amendment to the complaint at this juncture.  Having obtained summary judgment in their favor, Defendants have a right for this litigation to end.  Moreover, allowing this amendment exposes Defendants to approximately two years' worth of damages that they might otherwise avoid under the statute of limitations, if the case is dismissed and Plaintiff files a new action.[14]  That is hardly a lack of prejudice.

Finally, we think that denying the motion to amend makes practical sense from the perspective of judicial economy.  The most appropriate forum in which to litigate this case is New York.  Significantly, in July 2010, we dismissed Defendant Nelstar Publishing, Inc. ("Nelstar") from the case after concluding we could not exercise

---

[14]     Defendants argue that any claim Plaintiff pursues based on the newly-obtained copyright registration cannot relate back to the initial filing of this suit, because a party may not satisfy a condition precedent to suit after the statute of limitations has run, then amend the complaint to allege registration and have it relate back as though the condition had been satisfied from the outset.  [D.E. 239 at 14-17].  We need not decide this issue here.

personal jurisdiction over that particular Defendant. [D.E. 195]. We also determined that Nelstar was a necessary and indispensable party to this action and that Plaintiff could not proceed on Count 4, a claim for permanent injunction based on the composition "Do It," against all Defendants in Nelstar's absence. Accordingly, we dismissed Count 4 without prejudice. New York is the only jurisdiction in which Plaintiff may bring the composition claim against Nelstar and the other Defendants. Moreover, all Defendants in this case have stipulated to jurisdiction there. [*Id.* at 27, 33]. If Plaintiff re-files the matter in New York, it may pursue a claim that cannot be heard in our court.

These facts militate against allowing the amendment. Under the circumstances, justice does not require it. For the aforementioned reasons, we deny Plaintiff's request to amend the complaint.

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1)   We reaffirm our March 31, 2011 ruling and **GRANT** Defendants Timothy Z. Mosley p/k/a Timbaland and  Mosley Music, LLC's Motion for Summary Judgment [**D.E. 137**] as to the copyright registration issue.

2)   Plaintiff's Motion for Reconsideration or, in the Alternative, to Hold Entry of Final Order Briefly in Abeyance [**D.E. 230**] is **DENIED**.

3)   Plaintiff's Motion for Leave to Amend the Complaint [**D.E. 235**] is **DENIED**.

4)      **THIS CASE IS CLOSED** and any pending motions are denied as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 7th day of June, 2011.

_/s/    Edwin G. Torres_
EDWIN G. TORRES
United States Magistrate Judge